Kenneth Wayne LOVETT, Appellant

v.

The STATE of Texas, State

NO. 02-16-00094-CR, NO. 02-16-00095-CR

Court of Appeals of Texas, Fort Worth.

Delivered: June 15, 2017

Discretionary Review Refused October 18, 2017

ATTORNEY FOR APPELLANT: MILLIE L. THOMPSON, LAW OFFICE OF MILLIE L. THOMPSON, AUSTIN, TEXAS.

ATTORNEYS FOR STATE: SHAREN WILSON, CRIMINAL DISTRICT ATTORNEY; DEBRA WINDSOR, CHIEF OF THE POST-CONVICTION DIVISION; MARK KRATOVIL, LLOYD WHELCHEL, MELINDA WESTMORELAND, ASSISTANT CRIMINAL DISTRICT, ATTORNEYS FOR TARRANT COUNTY, FORT WORTH, TEXAS.

PANEL: SUDDERTH, KERR, and PITTMAN, JJ.

## OPINION[1]

### ELIZABETH KERR, JUSTICE

Citizens have a right to film the police. Texas citizens with a proper license also have a right to "open carry" firearms, though that right is not unlimited. Citizens may exercise both these rights simultaneously, although—as we will explain—circumstances can justify a police officer's asking a lawfully armed citizen to put away a deadly weapon and expecting that request to be honored.

This is true even when, as here, the weapon that Kenneth Wayne Lovett displayed is statutorily excluded from the definition of a "firearm": in our view it is not reasonable to expect the police (a) to instantly recognize a weapon as an excluded pre-1899 antique replica firearm that doesn't use rim-fire or center-fire ammunition or (b) to take someone's word for it, on the fly and at a traffic stop near which armed and vocal citizens have gathered to film the police and participate in Second Amendment activism. More to the point, no one disagrees that although the weapon in question might not have been a statutory firearm, it most certainly was a statutory deadly weapon. Under the disorderly-conduct statute, that is a category wholly distinct from a "firearm."

We need not here resolve any theoretical constitutional clashes involving either the right to free speech or the right to bear arms. Lovett was charged with and convicted of two relatively mundane offenses—disorderly conduct and interfering with the police's public duties—and has not directly attacked either statute's constitutionality (whether as facially unconstitutional or on an as-applied basis) in his points on appeal. Lovett attacks only evidentiary sufficiency.

Based on the jury's verdicts convicting him of both offenses, the trial court sentenced Lovett to 90 days in jail on each charge and ordered those sentences to run concurrently.

We reverse and order an acquittal on the disorderly-conduct offense (Tex. Penal Code Ann. § 42.01(a)(8) (West 2016)) and affirm Lovett's conviction for interfering with public duties (Tex. Penal Code Ann. § 38.15(a)(1) (West 2016)).[2]

---

1. See Tex. R. App. P. 47.2(a).

2. The disorderly-conduct charge arose in trial-court cause number 1445033 (our No. 02-16-00095-CR); the interference charge came first chronologically, in trial-court cause number 1445032 (our No. 02-16-00094-CR). Lovett's appellate briefing discussed these offenses in reverse filing order. For consistency in addressing the points he raises, we will too.

## Evidentiary Background

The State's sole witness at trial was Officer Fred Kemp of the Arlington Police Department. Officer Kemp testified that for months before January 24, 2015—the date he arrested Lovett—anywhere from one or two and up to ten people would swiftly appear at traffic stops or other sorts of police investigations trackable by radio. These groups would appear as early as within a minute or two after the police arrived on scene. At first, the groups simply filmed the traffic stops, but later they began bringing and displaying deadly weapons while they filmed. The department then decided to provide security in the form of additional officers to assist at and around traffic stops.

Around 5:30 p.m. on January 24, 2015, Officer Kemp and his partner Officer Nathan Deary were dispatched to the 2400 block of Park Row to assist two other officers with a traffic stop already in progress. Officer Kemp described the inherent dangers to police of traffic stops generally, such as getting hit by a vehicle, encountering weapons inside vehicles (a frequent occurrence), assaults, and people resisting or evading arrest.

This particular traffic stop presented its own special concerns, according to Officer Kemp: it involved a known felon with active warrants; the stop's location was sandwiched between two apartment complexes known for their high drug traffic and violence; and this section of Park Row was "very heavily trafficked" at the time. Indeed, video shot at the scene reveals what might best be described as rush-hour traffic. Officer Kemp's role was to provide security, a role that reflected the police's concerns for their own safety, detainees' safety, and the safety of civilians who might be around traffic stops and police investigations as innocent bystanders.

As Officers Kemp and Deary pulled up to this traffic stop, they noticed three camera-wielding people in a parking lot across the street and next to an apartment building. (Lovett was not among this initial group.) Officers Kemp and Deary crossed Park Row to the parking lot, telling the group that they could continue filming but needed to disarm. Only one of the three had a sidearm, and that person complied, walking back to his car and locking his weapon inside. On one of the two videos in evidence, Officer Kemp can be heard thanking that person.

As the two officers were then about to leave and go back across the street, a black Chevy Avalanche pulled up behind them in the parking lot. A passenger, Kory Watkins, got out with an AK-47 on his back; Lovett, the driver, emerged with a deadly weapon holstered on his hip.[3] Officer Kemp instructed them both to put their weapons in the vehicle. Watkins complied. Lovett did not.

According to Officer Kemp, the situation had become chaotic by this time, and the two videos (both recorded by the police-filming activists) corroborate his testimony that many people were now yelling. Someone loudly accused the police of "tyranny." Despite the provocations, the two officers were unperturbed and professional. After Officer Kemp gave Lovett two or three warnings to put his weapon away, Officers Kemp and Deary calmly arrested him without incident or resistance. Lovett was the only person at the scene who refused to put his weapon back in his vehicle.

---

3. As we will explain, although Lovett's holstered pistol was not a "firearm" under the penal code, his own expert agreed that it was a statutory "deadly weapon." In addition, Officer Kemp testified without contradiction that a holstered weapon could be removed in less than a second.

Lovett's pistol remained holstered, and from the videos it appears that the officers did not relieve him of it even while in the process of placing him under arrest.

Throughout the roughly 50 seconds between Lovett's arrival and his arrest, he was passive and—but for nonconfrontationally refusing Officer Kemp's directive—cooperative. Lovett can be seen on video in a T-shirt bearing one of the many now-ubiquitous twists on the British stiff-upper-lip slogan from World War II; his read "Keep Calm and Film the Police."

During the guilt–innocence portion of the trial, Lovett put on one witness, Charles Osborne, who is a former Marine and a weapons expert. When shown Lovett's weapon, he described it as a "remake of a Colt 1851 in .44 caliber originally designated as a Colt Navy." Under the penal code, it was considered a black-powder revolver—and thus not a "firearm"—but as Osborne acknowledged, it could still kill someone—and thus was a "deadly weapon." [4] According to Osborne, the pistol was a military firearm used during the civil war; killing was what it was designed to do.

On the videos, one person can be overheard repeatedly invoking penal code sections 46.01 and 46.02(3)(B) and telling Officers Kemp and Deary that both the first pistol the officers encountered and the one that Lovett carried holstered on his hip were "pre-1899 black-powder pistols" and therefore not firearms under the statute.

The officers declined the activists' offer to let them inspect the first pistol, and when Lovett arrived, the officers ignored the activists' attempts to persuade them that Lovett's pistol, even while holstered, could still be identified as a "pre-1899 black-powder pistol."

Osborne agreed that only a firearms expert would be able to tell at a glance that Lovett's weapon was a statutorily excluded black-powder pistol as opposed to one using rim-fire or center-fire ammunition. Osborne also acknowledged that if he was working perimeter duty while on military assignment and someone showed up with a weapon like Lovett's, it would "look like a firearm" or "like a deadly weapon" to him. But regardless of whether Lovett's pistol was a black-powder replica or an antique gun of some other sort, both Officer Kemp for the State and Osborne for the defense agreed: it could be deadly.[5]

### Standard of Review.

█ In our due-process review of evidentiary sufficiency to support a conviction, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found a crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Jenkins v. State,* 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the factfinder's responsibility to resolve conflicts in

4. The penal code excludes pre-1899 antique replica black-powder pistols from its definition of a "firearm." Tex. Penal Code Ann. § 46.01(3)(B) (West Supp. 2016) ("firearm" does not include "a replica of an antique or curio firearm manufactured before 1899, but only if the replica does not use rim fire or center fire ammunition"). Osborne's testimony nevertheless establishes that Lovett's pistol was a deadly weapon under the penal code. *Id.* § 1.07(a)(17) (West Supp. 2016) (defining a "deadly weapon" as "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury," or "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury").

5. Reflecting Osborne's view that Lovett's pistol was a deadly weapon, Officer Kemp testified that a "projectile" from an antique pistol could "kill easily at 50 yards."

the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

■ The factfinder alone judges the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate evidentiary weight and credibility and then substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based on the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, —— U.S. ——, 136 S.Ct. 198, 193 L.Ed.2d 127 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

### Discussion

**A. Disorderly conduct requires a *mens rea* that the State did not prove.**

■ The State alleged that Lovett "intentionally or knowingly display[ed] a deadly weapon in a public place, to-wit: on a public street in the 2400 block of East Park Row, in a manner calculated to alarm." [6]

The offense of disorderly conduct requires that "the actor must display the firearm [or other deadly weapon] '*in a manner calculated to alarm*,'" and the statute "specifically includes a *mens rea*: it states the person must act *intentionally or knowingly* when he displays a firearm [or deadly weapon] in a public place, and his displaying of the firearm [or deadly weapon] must have been *calculated* to alarm." *Ex parte Poe*, 491 S.W.3d 348, 354 (Tex. App.—Beaumont 2016, pet. ref'd) (emphases in original) (affirming denial of pretrial habeas-corpus writ and concluding that the statute is neither unconstitutionally vague nor unconstitutionally overbroad). Because penal code section 42.01(a)(8) does not define "manner," "calculated," or "alarm," the *Poe* court looked to the dictionary: "manner" is the "'mode or method in which something is done or happens'"; "calculated" means "'planned or contrived so as to accomplish a purpose or achieve an effect: thought out in advance: deliberately planned'"; and "alarm" means "'fear or terror resulting from a sudden sense of danger.'" *Id.* (quoting *Alarm, Calculated, & Manner*, Webster's Third New Int'l Dictionary (2002)).

A witness in *Poe* testified that the objective of open-carry activists is to educate the public, not to alarm it, and that this lack of intent to alarm "is why all rifles and shotguns are displayed in a safe[,] non-threatening manner." *See id.* at 351.[7]

Here, the gist of Officer Kemp's testimony was that having armed people show up to film the police only moments after a traffic stop began was, from the officers' perspective, alarming because it posed a

6. Penal code section 42.01(a)(8) forbids displaying "a firearm or other deadly weapon" under those circumstances. Texas Penal Code § 42.01(a)(8). The State initially filed an information accusing Lovett of displaying "a firearm," but the following week refiled the infor-

mation to replace "firearm" with "deadly weapon."

7. This makes sense as a general proposition; if the activists alarmed the public, they would alienate that same public and potentially defeat their own cause.

danger to everyone involved. The videos did show that at least one activist was openly hostile to the police; one voice can be heard ordering the police to leave and loudly decrying police tyranny. The videos also showed that as Officers Kemp and Deary were dealing with the original three activists, Lovett pulled in behind the officers and approached them from a different direction. In addition, while the officers were arresting Lovett a very short time later, a female with a video camera walked behind them, which appeared to concern Officer Deary as he can be seen looking over his shoulder to keep an eye on her until two additional officers arrived. In one video, when Officers Kemp and Deary initiate Lovett's arrest, a third officer peremptorily orders someone not to go back to the car and to stay away from the car. (The cars were where those activists who voluntarily disarmed had placed their weapons.)

We recognize that traffic stops are inherently dangerous to police officers. *United ed States v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2016) (en banc) (op. on reh'g). Such stops involving people who are armed, whether legally or illegally, pose yet a greater safety risk to police officers. *Id.* When a stop involves one or more passengers, the possible sources of harm to an officer increase. *Id.* at. 699. Police officers have an immediate interest in taking steps to assure themselves that someone with whom they are dealing is not armed with a weapon that could be used against them unexpectedly and fatally. *Id.*

"The presumptive lawfulness of an individual's gun possession . . . does next to nothing to negate the reasonable concern an officer has for his own safety when forcing an encounter with an individual who is armed with a gun and whose propensities are unknown." *Id.* at 701.

Of course, neither Lovett nor any of the activists were themselves subjects of the traffic stop. Lovett did, however, decide to show up, armed, across the street from where the police were doing their job—a job that Officer Kemp noted and we agree can be dangerous and unpredictable.

■ But these facts don't end our inquiry into whether the State satisfied its burden of proof. As our sister court noted in *Poe*, the statute's requirements that displaying a firearm (or other deadly weapon) must be done "intentionally or knowingly *and* in a manner calculated to alarm take the context of the actor's speech into question and require the State to meet a high burden of proving the requisite mental state." 491 S.W.3d at 355 (emphasis in original).[8] Certainly—and in any event the State does not contend otherwise—the mere presence of a firearm or deadly weapon in public cannot possibly supply the requisite *mens rea* for a disorderly-conduct conviction, or else anyone participating in Texas's embrace of lawful open carry would be guilty the moment he stepped outside his home visibly armed.

Here is what the videos showed pertaining to the calculated-to-cause-alarm element:

8. Poe had argued that penal code section 42.01(a)(8) has a "chilling effect on public displays of firearms as an exercise of First Amendment rights." *Id.* at 351. Lovett discussed free-speech rights at length in his appellate briefing, but only in the context of analyzing why the State did not present sufficient evidence of his intent to alarm, not as a constitutional challenge to the statute—unlike *Poe*, which directly engaged constitutional issues. That is, Lovett suggests that because he was so obviously a First and Second Amendment activist, the police (and the State) should have known that he lacked the requisite intent to violate the disorderly-conduct statute. We need not and do not go that far here.

- Lovett's pistol never left its holster, nor did he ever touch it.
- Even as Officers Kemp and Deary were arresting Lovett, they did not take the pistol away from him.
- Lovett's demeanor appeared designed *not* to alarm—he stood still, making no sudden movements.
- The police never drew their weapons, ordered Lovett to the ground, or seemed to view him as anything other than one of the activists.[9]
- When the officers initially confronted him, Lovett did maintain that he was not part of the group and had simply chosen that spot randomly for an open-carry walk—while wearing a shirt on which was written, "Keep Calm and Film the Police"—but a female voice can be heard to say during Lovett's arrest, "As you can see, one of our fellows is being ..." before her voice becomes indistinct.
- Although Lovett's claim of pure happenstance might have taxed the officers' patience (and insulted their intelligence), Lovett was not antagonistic, hostile, or threatening; when arrested, he was docile and compliant.

In short, Lovett did nothing that that would qualify as "calculated" to cause "fear or terror resulting from a sudden sense of danger." *See id.* at 354.

Even if the police validly feared having activists with deadly weapons and video cameras gathering repeatedly and within minutes at locations where the police were performing their duties, the evidence does not show that this generalized concern resulted from any action on Lovett's part that day suggesting that *he* intentionally displayed his weapon in a manner calculated to alarm the police or anyone else. The activists and their cause were not on trial; the wisdom of their actions was not on trial; and, most important, our conclusion should not be taken as any comment on constitutional issues. We hold simply that, on this record, the State did not prove all elements of disorderly conduct beyond a reasonable doubt.

More particularly, we hold that no rational factfinder could have found that Lovett intentionally or knowingly displayed his pistol in a manner calculated to alarm. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. We sustain Lovett's point attacking the sufficiency of the evidence to support his disorderly-conduct conviction, reverse the trial court's judgment, and render judgment of an acquittal.

**B. The State proved that Lovett interfered with public duties.**

■■■ The State alleged by information that Lovett, with criminal negligence, interrupted, disrupted, impeded, or interfered with Officer Kemp, who was

> a peace officer ... performing a duty or exercising authority imposed or granted by law, to-wit: preserving the peace within his jurisdiction and/or assisting in a traffic stop investigation by refusing to obey the commands of F. Kemp that [Lovett] remove himself from being in close proximity to the traffic stop while carrying a deadly weapon and/or by refusing to disarm himself and/or by refusing to obey orders regarding officer safety and/or civilian safety, and [Lovett] knew that F. Kemp was a peace officer.

Section 38.15 of the penal code lays out the elements: "(a) A person commits an

---

9. Recall that the Arlington PD began sending extra assistance (such as Officers Kemp and Deary here) to traffic stops precisely because clusters of activists had been swarming traffic-stop sites for some time.

offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with: (1) a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law . . . ." Tex. Penal Code Ann. § 38.15(a)(1). We will first review the evidence to determine if a rational jury could find that Officer Kemp was performing such a duty or exercising such authority under subsection 38.15(a)(1), and, if so, whether Lovett interfered with Officer Kemp.

We again note that Lovett does not challenge section 38.15's constitutionality, either as applied to him or in any other way.[10] *See, e.g., Faust v. State,* 491 S.W.3d 733, 742 (Tex. Crim. App. 2015), *cert. denied,* —— U.S. ——, 137 S.Ct. 620, 196 L.Ed.2d 515 (2017); *Momentoff v. State,* No. 02-12-00335-CR, 2013 WL 5967107, at *4–5 (Tex. App.—Fort Worth Nov. 7, 2013, no pet.) (mem. op., not designated for publication).

1. **Section 38.15(a)(1):** *Officer Kemp was performing a duty or exercising authority imposed or granted by law— providing security for the traffic stop—when he instructed Lovett to disarm.*

Under subsection 38.15(a)(1), the State first had to show that Officer Kemp was performing a duty or exercising authority imposed or granted by law. *See* Tex. Penal Code Ann. § 38.15(a)(1). We hold that the State did.

 The court of criminal appeals has written that the government has a significant interest in ensuring public safety and order. *Faust,* 491 S.W.3d at 748. A traditional exercise of the State's police powers

is to protect its citizens' health and safety. *Id.* Police officers have the lawful authority to maintain public safety, particularly when crowds of people are gathered and when a perceived possibility exists of a riot or other threat to public safety. *Id.* A government "must have some ability to protect" its citizens and both public and private property. *See id.* " '[W]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order appears;' " the State's power to prevent or punish is " 'obvious.' " *Id.* at 749 (quoting *Feiner v. New York,* 340 U.S. 315, 320, 71 S.Ct. 303, 306, 95 L.Ed. 295 (1951)).

In keeping with this authority, the police's specific ability to lawfully disarm someone is broad. The government code, for example, provides that a peace officer who is lawfully discharging his official duties "may disarm a license holder [to carry a handgun] at any time the officer reasonably believes it is necessary for the protection of the license holder, officer, or another individual." Tex. Gov't Code Ann. § 411.207(a) (West 2012). If an officer may disarm even a license holder for safety reasons, it follows that an officer may disarm anyone of a deadly weapon for the same reasons. *See id.*

Whether an officer was acting within the scope of his duties and whether the defendant committed an offense are not the same questions. In *Tucker v. State,* despite the fact that the officers were improperly trying to arrest the defendant for interfering, the court concluded that the officers were nevertheless lawfully discharging an official duty. (The defendant was charged with and convicted for assault, the offense

---

**10.** Although at trial and on appeal Lovett exhorted first the jury and now this court to consider his First and Second Amendment rights—arguing here that Officer Kemp's instructions were illegal because they violated

his constitutional rights to assemble, to speak, and to bear arms—whether any one of those rights was violated is not an issue that is properly before us within the context of a sufficiency point.

he committed as the police tried to arrest him for interfering.) 114 S.W.3d 718, 721–23 (Tex. App.—Corpus Christi 2003, pet. ref'd). In the same vein, even if an arrest or a search is unlawful, that unlawfulness is not a defense to prosecution for the offense of resisting an arrest or a search. *See* Tex. Penal Code Ann. § 38.03(b) (West 2016); *Gonzalez v. State*, 574 S.W.2d 135, 137 (Tex. Crim. App. [Panel Op.] 1978).

Because the evidence showed that Officer Kemp was performing security for and in the area of the traffic stop, we hold that the evidence sufficed to show that he was performing a duty or exercising authority imposed or granted by law within the meaning of subsection 38.15(a)(1). *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *see also* Tex. Penal Code Ann. § 38.15(a)(1).

### 2. Section 38.15(a): *Lovett interfered with Officer Kemp's job when Lovett refused to disarm.*

Lovett raises a number of arguments in claiming that he did not interfere with the traffic stop or with Officer Kemp's ensuring security around it. We address and disagree with them in turn.

### a. *The State proved the culpable mental state.*

The State alleged a mental state of criminal negligence—the lowest type of culpability. *See* Tex. Penal Code Ann. § 6.02(d) (West 2011).[11] The evidence showed that Lovett was aware he was carrying a pistol and that he was actively filming. As shown by Lovett's attire and the actions of those around him, he was among those activists whose purpose was both to film the police and to carry deadly weapons. The evidence also showed that Lovett knew that Officer Kemp had told him to put his pistol back

in his vehicle and that Lovett refused to comply. When viewing the evidence in the light most favorable to the verdict, we defer to the jury's determination that Lovett had the necessary culpable mental state. *See Murray*, 457 S.W.3d at 448.

### b. *Officer Kemp did not arrest Lovett for illegally carrying a pistol; rather, he arrested Lovett for interfering with that officer's attempts to secure the area around a traffic stop.*

Lovett contends that he was doing nothing illegal by carrying a pre-1899 black-powder pistol. *See* Tex. Penal Code Ann. §§ 46.01(3), (5), 46.02 (West Supp. 2016). That's true as far as it goes, but Lovett was not arrested for, indicted for, or convicted of unlawfully carrying a weapon. Rather, Lovett was arrested for, indicted for, and convicted of refusing to put a deadly weapon back in his vehicle when instructed to do so by Officer Kemp as part of Officer Kemp's attempt to secure the area around a traffic stop.

### c. *Officer Kemp did not invent his own law.*

Lovett also argues that Officer Kemp unilaterally decided that the law forbade openly carrying a pistol within visual distance of a traffic stop, with Lovett's maintaining that no such law exists. We disagree with how Lovett characterizes Officer Kemp's testimony, the gist of which was that the right to carry is not unlimited and that, for safety reasons, the police may disarm bystanders who are carrying deadly weapons where police are working. Though Officer Kemp did not articulate this point as directly as the *Faust* court and though he did not cite to government code section 411.207(a), he was nevertheless correct. *See Faust*, 491

---

11. To the extent the evidence showed a greater culpable mental state, the State still met its burden of proof. *See id.* § 6.02(e) ("Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged.").

S.W.3d at 748–49; *see also* Tex. Gov't Code Ann. § 411.207(a).

### d. The police's safety concerns were not specious.

Lovett brushes aside the officers' safety concerns as part of his sufficiency challenge. Detailing those various concerns below, we again disagree.

### i. By restricting attention to himself, Lovett diverted the officers' attention from the situation as a whole.

When asked how Lovett was impeding the investigation or interfering with Officer Kemp's attempts to assist with the traffic stop, Officer Kemp answered, "That is almost the worst-case scenario to have multiple people armed around you that have taken it upon themselves to track you on the radio and then interject themselves in what's going on." As he explained, "We have to take that one person at a time." "In this case," he continued, "we had to focus in on a subject that was refusing to disarm once he, you know, exited and then walked towards what was going on." As a consequence, Officer Kemp added, "We had no ability to check anyone else that was arriving after that, if they were armed as well, in order to disarm or to just ensure safety, period." That is, "When we have to focus in on that one person [with a deadly weapon], we are completely unable to provide any other security for that primary investigation that we were called there on scene to address."

### ii. For everyone's safety, Officer Kemp wanted to disarm anyone who was near the traffic stop with a deadly weapon.

Officer Kemp testified that having a group of people show up and interject

themselves into police activities is, from a law-enforcement perspective, "extremely abnormal"; the police are highly concerned with their own safety, the safety of detainees, and the safety of any civilians around traffic stops and police investigations. Officer Kemp said that he was there to provide security for the detainees, the officers, and the public, so he did not want an armed member of the public in the area. To paraphrase Officer Kemp, the officers were trying to secure the area by eliminating all deadly weapons, but Lovett thwarted—interfered with—that objective when he insisted on remaining armed.

### iii. The officers' safety concerns went beyond Lovett personally and even beyond the activists as a group.

Lovett further argues that he was a Second Amendment activist, that the activists had not on earlier occasions done anything untoward, and that Officer Kemp should have just ignored him. We are not persuaded. Officer Kemp's testimony made clear that it was not simply Lovett's possessing a deadly weapon that caused the police concern. The concern stemmed from the facts that Lovett possessed a deadly weapon close to a traffic stop; that traffic stops are inherently dangerous to police; and and that this traffic stop was occurring between two apartment complexes and on a busy street in an area known for high drug traffic and violence.[12]

### iv. The police had effected the arrest, but they had not completed the traffic stop.

Lovett also downplays his actions by arguing that the traffic-stop arrest was

---

**12.** Lovett's expert, Osborne, testified that while in the Marines he had had guns negligently discharge perhaps five times even though he was with people who were trained to handle firearms. Osborne also said that unless a police officer knew Lovett personally, the officer would have no idea whether Lovett had received any firearms training. Moreover,

completed by the time he arrived. One of the videos shows the arrestee being placed in a squad car perhaps 30 seconds before Lovett showed up. The same video shows that fewer than 30 seconds before Officers Kemp and Deary arrested Lovett, another officer can be seen standing by the arrestee's vehicle with the driver's-side door open and, moments later, an officer can be seen standing behind the arrestee's vehicle. The video does not show whether the squad car containing the arrestee was still there when Officers Kemp and Deary arrested Lovett.

Although the arrestee might have been inside a squad car by the time Lovett arrived, the traffic stop itself was still ongoing, as shown by the presence of officers still near the arrestee's vehicle. The confinement of the arrestee to a squad car might have signaled the elimination of one threat to the police, but it did not necessarily signal the end of all threats to those processing the traffic stop.

The jury was within its prerogative to believe that the traffic stop was still in progress—at least in some sense—when Officers Kemp and Deary arrested Lovett. *See Blea*, 483 S.W.3d at 33.

v. Although Lovett had not yet reached the perimeter, Officer Kemp made it clear that where Lovett stood was far enough.

Lovett argues that he had not yet reached the perimeter—but he was headed

that way when the officers stopped him. Furthermore, the perimeter was the distance at which Officer Kemp wanted the (disarmed) activists to remain from the traffic stop. Lovett made clear that he intended to remain armed.

### 3. The evidence was sufficient.

In sum, we hold that a rational factfinder could have found beyond a reasonable doubt that by refusing to disarm, Lovett interrupted, disrupted, impeded, or otherwise interfered with Officer Kemp while Officer Kemp was performing a duty or exercising authority imposed or granted by law. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *see also* Tex. Penal Code Ann. § 38.15(a).

We overrule Lovett's point attacking the sufficiency of the evidence for interference with public duties.

### Conclusion

We reverse the conviction for disorderly conduct and order an acquittal. We affirm the conviction for interference with public duties.

---

although the perimeter was four lanes of traffic away from the traffic stop, Officer Kemp testified that even an antique pistol could easily kill someone at 50 yards. The record does not establish the exact distance between

the traffic stop and where the activists were, although there were a few references to its being around 80 to 100 feet, or well within 50 yards.