

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00025-CR

———————————————

DAVANTE PETERS, Appellant

V.

THE STATE OF TEXAS

On Appeal from County Criminal Court No. 9
Tarrant County, Texas
Trial Court No. 1577623

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Davante Peters appeals his conviction for interference with public duties. In three issues, Peters argues that the evidence in insufficient to support his conviction. Because we conclude after viewing the evidence in a light most favorable to the jury's verdict in this case that the evidence sufficiently supports that verdict, we affirm.

## II. BACKGROUND

On September 16, 2018, the season opener for the Dallas Cowboys at AT&T Stadium in Arlington, police officers arrested Peters and several other protestors for causing disruptions to the flow of traffic, crowd control, and emergency-vehicle access. By information, the State charged Peters with two counts of interference with public duties.[1] One count alleged Peters had interfered with the driver of an emergency vehicle who was attempting to provide medical services, and another count alleged that Peters had interfered with a peace officer attempting to execute his duties. Eventually, a jury trial was held regarding these charges against Peters and other charges against a co-defendant, who was also one of the protestors arrested that day.

---

[1]The State originally charged Peters with four counts of varying offenses regarding obstructing the stadium's entries, but later amended the information to include five counts of interference with public duties. The State, however, only proceeded against Peters on two of the interference offenses.

## A. Keith Brooks's Testimony

At trial, Keith Brooks, Assistant Director of Public Works and Transportation for the City of Arlington, testified that he works events at AT&T Stadium, and when there, he is considered the on-grounds "TTS Commander" in charge of traffic flow. By Brooks's account, whenever a big event is held at the stadium, the combination of traffic and pedestrian presence makes it difficult to control the flow of traffic, especially if there is an "accident or [if] any little thing . . . comes up." Brooks explained that the major corridors to the stadium off of Interstate 30—where most of the traffic comes from—are Collins Street, AT&T Way, and Ballpark Way.

According to Brooks, officers at the intersections near the stadium during events are specifically for pedestrian control—directing pedestrians when they can and cannot walk. Regarding the events of September 16, 2018, Brooks said that a group of protestors "shut down" traffic for "four and a half to five minutes" at the intersection of Randol Mill Road and Collins prior to the game.

## B. Sergeant Sebastien Peron's Testimony

Sergeant Sebastien Peron of the Arlington Police Department, who works in the Homeland Security and Special Events Unit, testified that he is specifically assigned to AT&T Stadium as the liaison for the Dallas Cowboys and for any event that happens at the stadium. By Peron's account, he was working at AT&T Stadium on September 16, 2018. When asked about his specific duties during any event, Peron said,

So, on event day, it's a combination of things depending on where we are within the event. So as the liaison, I kind of coordinate our briefings for all of our staff that show up to work. I stay in contact with stadium officials, that being the Director of Security and Director of Operations, throughout the event. I check on player and team movements. I check on other supervisors throughout the event. My primary responsibility is inside the stadium throughout the event itself. And so there's no one specific thing that I do. But as a liaison, I kind of stay in contact with parking, employees that are overseeing traffic operations, as well as interior security operations. There's just a number of things I do throughout the event.

Regarding whether his duties also include crowd control, Peron said, "It really depends on where the crowd issue is." But Peron did say that he did not "have a fixed assignment." Although he said that his normal duties were typically inside the stadium, he averred that as part of his duties, he involved himself in outside-of-the-stadium duties "as warranted."

According to Peron, a group of people had informed officials that they would be there that day to "protest some of the more recent incidents that had occurred throughout the region." Peron said that this same group of protestors had demonstrated at the stadium previously and that he did not have any reason to believe the group would be anything other than peaceful.

By Peron's account, at roughly 6:30 p.m. and at a time when the largest volume of fans attending the game were arriving, he stepped outside of the stadium's Gate A[2]

---

[2]At times, Peron described certain entrances as an "Entry" followed by a letter, but at other times he would refer to the same entrances as "Gate" followed by a letter. We will use "Gate" throughout this opinion for consistency.

to observe the group of protestors, which he described as initially being peaceful and not interfering with his ability to do his job. Peron said that Peters did not appear to be a part of the original protest. But then, a smaller group of the protestors standing just outside of the actual protest caught Peron's eye because they were wearing shirts that said, "F[***] the police." From there, the smaller group of protestors "started walking in an eastern direction towards Gates B, C, and D," which Peron described as one of the larger gate areas that allowed a high volume of people to enter the stadium. Peron said that a large number of people entering the stadium through Gates B, C, and D would have been arriving through the northeast intersection of Collins and Randol Mill.

According to Peron, as the smaller group of protestors got outside of Gates B, C, and D, they began to form "a human chain. They were holding hands, arms were extended, and [they] started to say different things in concert with each other; for example, '[N]o justice, no peace,' things of that nature, and that's when I realized that we had an issue." Peron said that the group was also using profanity and was loud.

Peron explained that the group that formed the "human chain" affected fans' ability to get into the stadium efficiently, that the crowd of fans attempting to enter the stadium began to grow, and that tensions began to rise among them. This caused Peron two major concerns:

> My main concern was I wanted to make sure we had an effective
> number of resources there to protect the protesters. Secondly, I didn't

5

want the fans to get agitated to the point where they were maybe going to try to attack or assault any members of that protest group.

At one point, the fans began to interact with the group of protestors, causing Peron to call for more officers to come to the area.

Peron said that the growing crowd and the continued presence of the protestors took officers away from their primary responsibilities. Peron described his primary responsibilities as "going around and checking the different entries and gates to ensure that our officers were standing and manning these gates as they were instructed to do because often times during NFL games the stadium or the venue will get audited by the NFL." And Peron stated that although he typically did not have duties regarding things going on outside of the stadium, because of what was transpiring with the protestors, his responsibilities "grew," and he had to step out to help with traffic flow, crowd control, and emergency-vehicle access to and from the stadium.

Regarding the smaller group of protestors, Peron described how they eventually left Gates B, C, and D and proceeded west and again formed a "human chain" preventing other fans from entering the stadium at Gates H, J, and K. Ultimately, the smaller group of protestors made their way to the intersection of Collins and Randol Mill by crossing six lanes of traffic while not using the crosswalk. Peron followed them.

According to Peron, the intersection of Collins and Randol Mill is a busy intersection on game days, with many drivers not attending the game also using the intersection. The group continued to walk around the roadway, sometimes in circles, without using the crosswalks or waiting for a signal to walk, so Peron approached some of them and asked them to get on the sidewalk, but they refused. Peron said that the group's conduct again began to have a negative impact on traffic flow. By Peron's account, the group's conduct also interfered with his and other officers' ability to do their jobs because they were no longer able to effectively move pedestrians or vehicles during that time. When asked whether the group had "essentially interfere[d] with [his] ability or duty to help with traffic control," Peron said, "They did." Peron also said that the group's conduct interfered with "an incident where we had a fire truck and ambulance that were trying to get through the intersection," but that they "were delayed as well simply because we had lost control of the intersection as a result of the protestors."

Peron testified that the group briefly moved away from the intersection of Randol Mill and Collins, but ultimately made their way back a second time, where they formed "a circle holding hands and giving the appearance that they were . . . praying or [something]." Peron could see at the time that the group standing in the circle was again in the intersection.

In court, Peron identified Peters as one of the participants in the smaller group at Randol Mill and Collins. Peron said that Peters, his co-defendant, and others

7

"created disruption in our ability to effectively move both pedestrians and cars in a safe and timely manner during that time." He stated that the latest group activity also prevented an emergency vehicle from getting through the intersection. When he was specifically asked whether the group's conduct had impacted his duty to make sure an emergency vehicle had clear access to and from the stadium, Peron replied, "Yes, ma'am." Peron averred that the group, including Peters, had interfered with his ability to perform his duties and job for almost an hour by their conduct plus the time needed to arrest nine individuals. While Peron was on the stand, the State published for the jury video footage from a pole camera that had captured the group's final entry into the intersection and their subsequent arrests. Peron again identified Peters in the video for the jury.

Although Peron said that he would not characterize the smaller group's conduct as violent or hostile, he did say that their conduct "obstructed a passageway and interfered with our duties that day." Peron again said that because of the group's conduct, his primary duties "changed . . . and adapted" to what was transpiring. According to Peron, at one point, his duty had transformed into reporting to command what he was seeing outside the stadium.

On redirect, the following exchange occurred:

[Prosecutor]: I want to make something very clear, Sergeant. When you woke up on September 16th, 2018, was your primary duty to handle events that took place inside the stadium?

[Peron]: Yes, ma'am.

8

[Prosecutor]: But, also, as a sergeant of the Arlington Police Department and with the Special Events Unit, do your duties sometimes change based on what happens at the stadium?

[Peron]: Yes, ma'am.

[Prosecutor]: So, as an officer, once you walk outside of the gate and you notice some crowds building up, do you also take on the duty of managing and coordinating crowd control, correct?

[Peron]: Yes, ma'am.

[Prosecutor]: And as an officer and sergeant, once you get to an intersection, in this case, Collins and Randol Mill, you then take on the duty to coordinate the flow of traffic, correct?

[Peron]: Yes and no. I mean, the way our command structure is set up out there is that we have interior operation[s] and exterior operations. And so even though I was standing in the middle of the intersection that day, that wasn't my primary responsibility was to move traffic. I was more focused on the protesters and the individuals standing out in the middle of [the] intersection and trying to determine how we were gonna respond to that.

[Prosecutor]: We understand that while it might not be your primary, you are assisting in that duty, correct?

[Peron]: That's correct, yes.

[Prosecutor]: And, also as an officer and sergeant, once you get to the intersection of Randol Mill and Collins, you also had a duty to help or assist in providing emergency vehicles a clear access way, correct?

[Peron]: Yes, ma'am.

[Prosecutor]: And going back to the gates in which they were standing, did that affect your ability to perform these duties?

[Peron]: Yes.

9

[Prosecutor]: And would their behaviors at the intersection of Collins and Randol Mill, did that affect your ability to do those duties?

[Peron]: Outside?

[Prosecutor]: Do what?

[Peron]: Which duties are you talking about specifically?

[Prosecutor]: At the intersection of Collins and Randol Mill.

[Peron]: Yes. It impacted the officers' abilities that were assigned to that intersection to effectively move pedestrians and traffic.

[Prosecutor]: And yourself, once you got out there, correct?

[Peron]: Yes.

## C. Assistant Fire Chief Gerald Randall's Testimony

Assistant Fire Chief Gerald Randall of the Arlington Fire Department's Fire and Rescue Support Division also testified about the events on September 16. According to Randall, he and his employees received fifty-six calls for ambulances or medical assistance on that night. Randall said that the group of protestors that broke off and went to the intersection of Randol Mill and Collins interfered with his ability to get resources to and from emergencies. Specifically, Randall recalled the inability of one of the ambulances he supervised to get through the intersection to assist "a chest pain call." Randall said, "So to get to the main first aid room where the patient was located in order to pick them up, they had to come through the intersection of Randol Mill and Collins, which had obviously been blocked and slowed down at this point."

10

By Randall's account, the group of protestors at the intersection "were blocking traffic in all different directions. The police were doing their best to try to manage that." When asked how the protestors had interfered with a dispatched ambulance by their conduct at the intersection, Randall said, "Because the ambulance was following the directions of the police officers who were securing the entire intersection." Randall added, "If the ambulance had blown through there without following instructions, then you could have had a disaster. The ambulance could have hit somebody. So the ambulance was actually directed to slow down by the police officers who were there."

## D. Peters's Testimony

Peters testified that he had gone to AT&T Stadium only to observe the protest on September 16 but that later he joined in the protest to help spread the awareness of two individuals who had been "killed by police -- police officers." According to Peters, he was not involved with the group of protestors that interfered with fans getting through the gates of the stadium. He was, however, involved with both incidents that occurred at the intersection of Randol Mill and Collins. Peters said that at no time did police speak to him or motion that he or anyone in the group should leave the intersection and that if they had, he would have "immediately complied." Peters testified that he and the others in the group were only in the intersection while the pedestrian light was on, indicating it was free or safe for people to cross the intersection. He also said that he did not remember being in the intersection when

11

traffic attempted to cross at the same time and that he did not believe that the group interfered with the flow of traffic "whatsoever."

By Peters's account, when the traffic light would turn from red to green, traffic was able to flow despite the group's activities. He also said that if traffic was impeded, it was because of the bicycle officer's presence. Peters averred that he had no intention of committing a criminal act while protesting at the stadium and that once police started making arrests, he and others began to leave the intersection. He also said that he would not have purposely interfered with an officer coordinating traffic flow or crowd control and that he agreed an ambulance driver who is attempting to assist a person in medical need should not be impeded.

## E. The Jury's Verdict and Peters's Sentence

Although having been charged with two counts of interference with public duties, the jury returned a guilty verdict only on the count charging Peters with having interfered with a peace officer attempting to execute his authorized duties; namely, interfering with Peron's duties of coordinating the flow of traffic, crowd control, or providing access to emergency services. *See* Tex. Penal Code Ann. § 38.15(a)(1). The jury assessed punishment at seventy-five days in jail and a $300 fine. The trial court suspended the confinement portion of the verdict, placed Peters on community supervision for twelve months, and assessed judgment accordingly. This appeal followed.

12

## III. DISCUSSION

All three of Peters's issues allege that the evidence is insufficient to support his conviction. Specifically, Peters argues that (1) there is a material variance between the charging instrument and the evidence introduced at trial, (2) the evidence is insufficient to show that he interfered with Peron's duties, and (3) the evidence is insufficient to show that Peron's duties included traffic and crowd control. The State argues that Peters is disregarding relevant testimony in his analysis and that the evidence, when viewed in a light most favorable to the jury's verdict, is sufficient to support the trial court's judgment. We agree with the State.

### A. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman*, 520 S.W.3d at 622.

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622. We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's.

13

*Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

To determine whether the State has met its *Jackson* burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The "law as authorized by the indictment" means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for

14

that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements."). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599.

## B. The Charge and the Law of Interference with Public Duties

As to the offense he was convicted of, the State alleged by information that Peters, with criminal negligence, interrupted, disrupted, impeded, or interfered with Peron, who was "a peace officer, who was performing a duty or exercising authority imposed or granted by law, namely coordinating the flow of traffic, crowd control, or providing access to emergency services, by walking through the intersections of Collins and Randol Mill." This allegation tracks the language of Section 38.15 of the Penal Code which lays out the elements of interference with public duties: "(a) A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with: (1) a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law . . . ." Tex. Penal Code Ann. § 38.15(a)(1).

## C. No Material Variance

In his first issue, Peters argues "that a material variance exists between the allegation in the information and the proof at trial." Specifically, Peters contends that the "evidence did not show that [he] did anything to interfere with Officer Peron's duties," and that "[a]t most the evidence showed that [he] interfered with some other

15

police officer's duties." Peters's argument is founded on his contention that "Peron testified that he was able to conduct his duties without interference." Peters also bases his argument on Peron's testimony that once he was outside the stadium his duties transformed to include watching the protesters and reporting back to the Command Post. Peters points out that Peron never testified that his duties included traffic flow, crowd control, or providing access to emergency services. The State counters that Peron testified that his duties included coordinating the flow of traffic, crowd control, or providing access to emergency services and that Peters is overlooking Peron's specific testimony about these duties.

A "variance" occurs when there is a discrepancy between the allegations in the charging instrument and the proof at trial. *Gollihar v. State*, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001). In such a situation, the State has proven the defendant guilty of a crime but has proven its commission in a manner that varies from the allegations in the charging instrument. *Id.* We treat variance claims as insufficiency-of-the-evidence problems.[3] *See id.* at 247.

As the State points out, Peron testified on redirect that even though his primary duties were to handle events that took place inside the stadium, when he went outside, he also took on the duty of managing and coordinating crowd control and traffic flow

---

[3]Because of our resolution of Peters's first issue, we need not address whether Peters's claim that a charging instrument that lists certain duties when the evidence adduced at trial does not support those duties is a "material" variance as opposed to a nonmaterial variance. *See Gollihar*, 46 S.W.3d at 246–48.

and providing emergency vehicles clear access. Peron had provided even more testimony about these duties on direct examination. Indeed, Peron had said on direct that as the protesters continued their activities, his responsibilities "grew," and that he had to help with traffic flow, crowd control, and emergency-vehicle access to and from the stadium. Thus, there is evidence in the record that Peron's duties included the "flow of traffic, crowd control, or providing access to emergency services" as alleged in the information. We conclude that there was no variance, material or otherwise, between the State's allegation and the evidence at trial. *See Gollihar*, 46 S.W.3d at 246. We overrule Peters's first issue.

## D. Peters's Interference with Peron's Duties

In his second issue, Peters argues that the evidence is insufficient to prove that he interfered with Peron's duties. Peters contends that Peron "testified that when [Peters] participated with the protest that Peron's duties had changed and that he did those new duties without interference." According to Peters, "no reasonable juror could have found beyond a reasonable doubt that any act by [Peters] interfered with Officer Peron's duties or the exercise of his authority."

At trial, when asked whether the group, including Peters, had "essentially, interfere[d] with [his] ability or duty to help with traffic control," Peron said, "They did." He also said that the group, including Peters, had impacted his duty to make sure an emergency vehicle had clear access to and from the stadium. And he testified that Peters, Peters's co-defendant, and other protesters from the smaller group

17

"created disruption in our ability to effectively move both pedestrians and cars in a safe and timely manner during that time."

There was also evidence from other witnesses that Peters had interfered with Peron's duties. Brooks testified that officers at intersections near the stadium performed the duty of crowd control and that a group of protestors had "shut down" traffic at the intersection of Randol Mill and Collins. Given Peron's testimony that his duties had grown to include crowd control and that Peters was a part of the group at the intersection, a reasonable inference from Brooks's testimony is that Peters, as part of the group of protestors, interfered with Peron's duties of controlling the crowd. *Murray*, 457 S.W.3d at 448 ("This [sufficiency-of-the-evidence] standard tasks the factfinder with resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts."). Additionally, Randall testified that the group of protestors at the intersection were blocking traffic despite police doing "their best to try to manage that." Specifically, Randall said that the group had interfered with an ambulance attempting to navigate the intersection; thus, Randall's testimony supports that Peters interfered with Peron's duty of providing access to emergency services.

We conclude that a reasonable factfinder could have found beyond a reasonable doubt that Peters interfered with Peron's duties of traffic flow, crowd control, or providing access to emergency services. *See Queeman*, 520 S.W.3d at 622; *see also Lovett v. State*, 523 S.W.3d 342, 351 (Tex. App.—Fort Worth 2017, pet. ref'd)

18

("Because the evidence showed that Officer Kemp was performing security for and in the area of the traffic stop, we hold that the evidence sufficed to show that he was performing a duty or exercising authority imposed or granted by law within the meaning of subsection 38.15(a)(1)."). We overrule Peters's second issue.

## E. Evidence of Peron's Duties

In his third issue, Peters argues that the evidence is insufficient to establish that Peron's duties included traffic flow, crowd control, and access to emergency services. By Peters's account, "Peron testified that there was no other duty other than to report to command" once he stepped outside the stadium.

As discussed above, Peron testified that even though his primary duties were to handle events that took place inside the stadium, when he went outside, he also took on the duty of managing and coordinating crowd control, traffic flow, and providing emergency vehicles a clear access way. Thus, a reasonable factfinder could have found beyond a reasonable doubt that Peron's duties included traffic flow, crowd control, or providing access to emergency services. *See Queeman*, 520 S.W.3d at 622; *Lovett*, 523 S.W.3d at 351. We overrule Peters's third issue.

## IV. CONCLUSION

Having overruled Peters's three issues on appeal, we affirm the trial court's judgment.

19

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  May 6, 2021