**Opinion issued February 19, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00005-CV
_____

## IN RE E.B.S., A CHILD

---

**On Appeal from the County Court at Law No. 1**
**Galveston County, Texas**
**Trial Court Case No. 17-JV-0093**

---

## MEMORANDUM OPINION

Appellant, E.B.S., a juvenile, appeals from an order adjudicating her delinquent for committing the offense of threatening to exhibit or use a firearm on school property.[1]  After a disposition hearing, the trial court placed appellant on

---

[1]  *See* Act of May 23, 2007, 80th Leg., R.S., ch. 704, § 1, 2007 Tex. Gen. Laws 1331, 1331, *amended by* Act of May 24, 2017, 85th Leg., R.S., ch. 795, § 1, 2017 Tex.

juvenile probation for twelve months. In her sole issue, appellant challenges the legal sufficiency of the evidence to support the jury's finding that she committed the offense.

We affirm.

## Background

In its first amended petition, the State alleged that appellant engaged in delinquent conduct as follows:

> [O]n or about the 6th day of March, 2017 in Galveston County, Texas, [E.B.S.] did then and there, in a manner intended to cause alarm to [M.B.] and/or [V.K.] and/or [T.O.] and/or [J.D.], intentionally threaten to exhibit and/or use a firearm at Dickinson High School, a public school, against the peace and dignity of the State, such alleged conduct constituting a Third Degree Felony pursuant to 37.125 of the Texas Education Code.

At the time of the conduct at issue, appellant was fifteen years old.

At the adjudication hearing, complainant M.B. testified that she and appellant were classmates in their ninth-grade English class at Dickinson High School ("DHS"). M.B. testified that, on March 6, 2017, she, appellant, and complainant T.O. went to the school library together. While they were walking back to class, appellant told M.B. and T.O. that she was "going to shoot up the school." M.B.

Sess. Law Serv. 3349, 3349–50 (current version at TEX. EDUC. CODE ANN. § 37.125). We apply the version of the statute in effect at the time of the commission of the offense. *See* Act of May 24, 2017, 85th Leg., R.S., ch. 795, § 2, 2017 Tex. Sess. Law Serv. 3349, 3350.

testified that she was not worried about it until appellant also said that she had access to a gun. M.B. told appellant that she was "crazy for doing something like that because she could go to jail for it." Appellant replied that "that was the point" and laughed. M.B. noted that appellant's laughter was not "the joking type." M.B. testified that she was alarmed and feared for her life. She was concerned that appellant was "going to shoot up the school" and would shoot her or her friends.

M.B. further testified that, when she, appellant, and T.O. arrived back in class, appellant sat down, asked how to spell certain students' names, which included complainant J.D., and wrote something in a book. Appellant told M.B. that she would let her know when she was "going to shoot the school" and added that it would occur during her Spanish class because students in that class had been rude to her. M.B. did not report the matter to school officials because she was afraid that appellant would discover that she had told. Rather, M.B. reported appellant's statements to her mother by text. M.B. also told another classmate, complainant V.K., who was J.D.'s best friend, to warn J.D. that appellant had listed her as someone whom she would shoot. After class, M.B. also went to find J.D.

T.O., who was also a student in appellant's English class, testified that, on March 6, 2017, while she, appellant, and M.B. were walking back to class from the library, appellant was humming a song that appellant said was "about shooting the school up." At first, T.O. thought that appellant was joking. However, T.O. felt

3

nervous and feared for her life after appellant stated that, if given the chance, she would shoot certain people, including J.D. She noted that she was the most afraid that she had ever been. When T.O. and M.B. asked appellant whether she would kill them, she replied that she would not because she liked them. When another student opened the door to their classroom, however, appellant said, "Yes, him I would kill."

T.O. further testified that, once she, appellant, and M.B. returned to class, appellant said that, on the day that the shooting was to take place, T.O. would hear appellant running down the hallway, hear the "sound of the gun going against the locker," and hear appellant saying, "I'm coming for you." T.O. believed that appellant intended to alarm her, and she feared for her safety and for that of the other students. T.O. decided that, after class, she would report the matter to school officials. However, before she got to the office, another student had reported it.

V.K., who was also a student in appellant's English class, testified that when appellant, M.B., and T.O. returned from the library on March 6, 2017, appellant stated that she was "going to shoot up the school" and that she did not care whether she went to jail. V.K. noted that she had known appellant since elementary school, knew her well enough to discern when she was joking and when not, and V.K. believed that appellant was not joking and intended to scare her. Immediately after class, V.K. told J.D. about appellant's threat. Although V.K. went to the principal's office because she was scared, she did not report the matter.

4

J.D., who was a student in appellant's ninth-grade Spanish class, testified that she had known appellant since the sixth grade. J.D. and her friends sometimes had disagreements with appellant. On March 6, 2017, V.K. told J.D. about appellant's threat to bring a gun to school and to use it on her. J.D. took the comments seriously, felt that appellant intended to scare her, and felt that her life was in danger. She reported appellant's comments to school officials.

DHS assistant principal, Joseph Trahan, testified that, on March 6, 2017, he received a phone call from a concerned parent about a gun threat on campus. Trahan obtained statements from M.B., T.O., V.K., and J.D., who each reported similar facts regarding a threat to the campus involving a gun and a "possible hit list.," i.e., the list that appellant had made in class. After Trahan contacted law enforcement, he called appellant to his office, where he searched her bag for weapons and a female assistant principal searched appellant's person. No weapons were found. Appellant gave Trahan the following statement, which the trial court admitted into evidence:

> What I said I me[a]nt as a joke. I had no intention of harming anyone. What I said is that I would help but it was a joke. I said I would help if anyone had the idea but it was a joke. I don't want to harm anyone. I don't like violence. I said I would help if anyone had the idea to shoot up the school.

Trahan asked appellant for the reported "hit list," and she pulled a spiral notebook from her bag and showed it to him. In the notebook, which the trial court admitted into evidence, she had written the following note:

5

F–Freddy's coming to get ya.
U–You are screwed.
N–Nowhere you can hide at all!
From the Fazbear Arcade

People I hate:
1.     [J.D.]
2.     [D.G.]
3.     [J.M.]

Trahan noted that the names of the students on the list matched those given by complainants as students whom appellant had threatened to shoot.

Trahan further testified that, based on his investigation, he believed that appellant had made threats to bring a firearm to school and use it, and that she did so with a serious intent to alarm people. Trahan noted that, after his investigation, appellant's mother notified him that appellant had been subjected to bullying at school. Trahan testified that he, along with other school officials, fully investigated the matter and determined that "[n]o bullying had occurred." Trahan imposed, as a disciplinary measure against appellant, three days' suspension and 30 days' placement at the district's alternative campus. He further referred the matter to law enforcement officials.

Appellant testified that, while walking back to class from the library with M.B. and T.O. on March 6, 2017, she was humming a song, which she identified as "Psychosocial," by Slipknot. She testified that when M.B. and T.O. asked her a question about shooting students, she just named a list of people, including J.D., who

6

were in her Spanish class. Appellant explained that these people were "messing with" her, talked about her and her friends, and caused a lot of trouble. She denied having said that she would bring a gun to school and shoot people. With respect to her written statement to Trahan, she explained that M.B. and T.O. had brought up shooting students at the school and she, thinking that they were joking, had agreed to help. Appellant testified that she wrote the names in her notebook during a game with friends long ago. She testified that she had never had access to a gun.

During cross-examination, appellant admitted having said that she would "shoot up the school" and the specific people she had named. She testified, however, that she made up the threats because she did not like the kids who had picked on her. She meant it as a joke and never meant to scare anyone.

After the hearing, the jury found "true" that appellant had engaged in delinquent conduct as alleged. And, the trial court adjudicated appellant delinquent. After a disposition hearing, the trial court placed appellant on juvenile probation for twelve months. Appellant moved for a new trial, which the trial court denied.

## Sufficiency of the Evidence

In her sole issue, appellant argues that the evidence is legally insufficient to support the jury's finding that she intended to alarm the complainants by her threats to bring a gun to school and to shoot students.

*Nature of the Proceedings and Standard of Review*

"The Legislature enacted the Juvenile Justice Code as a separate system for the prosecution, adjudication, sentencing, and detention of juvenile offenders to protect the public and provide for the wholesome moral, mental, and physical development of delinquent children." *In re Hall*, 286 S.W.3d 925, 927 (Tex. 2009); TEX. FAM. CODE ANN. § 51.01(1), (2), (3). The Code covers the proceedings in all cases involving a child's delinquent conduct. TEX. FAM. CODE ANN. § 51.04(a). Juvenile courts generally have exclusive original jurisdiction over proceedings involving a child's delinquent conduct by a person who was a child at the time that the person engaged in the conduct. *In re Hall*, 286 S.W.3d at 927. Generally, a "child" is defined under the Code as a person who is ten years of age or older and under seventeen. TEX. FAM. CODE ANN. § 51.02(2). Delinquent conduct is defined as, inter alia, "conduct, other than a traffic offense, that violates a penal law of this state or of the United States punishable by imprisonment or by confinement in jail." *Id*. § 51.03(a)(1).

In a juvenile proceeding, the trial court first conducts an adjudication hearing for a fact-finder to determine whether the juvenile engaged in delinquent conduct. *Id*. § 54.03. If the fact-finder determines that the juvenile engaged in delinquent conduct, then the trial court conducts a disposition hearing. *Id*. § 54.03(h). "Disposition is akin to sentencing and is used to honor the non-criminal character of

8

the [juvenile] proceedings." *In re B.D.S.D.*, 289 S.W.3d 889, 893 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (internal quotations omitted). An order of adjudication or disposition generally does not constitute a criminal conviction. *See* TEX. FAM. CODE ANN. § 51.13(a); *In re B.D.S.D.*, 289 S.W.3d at 893.

The Texas Supreme Court has classified juvenile adjudication proceedings as "quasi criminal" because, although proceedings under the Family Code are generally governed by the Texas Rules of Civil Procedure, an exception is made for the burden of proof to be borne by the State in adjudicating a child to be delinquent. *In re D.J.C.*, 312 S.W.3d 704, 711 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *see also* TEX. FAM. CODE ANN. § 51.17(a), (c); *In re B.L.D. & B.R.D.*, 113 S.W.3d 340, 351 (Tex. 2003); *In re D.A.K.*, 536 S.W.3d 845, 847 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (noting that, although juvenile-court proceedings are classified as civil, they are "quasi-criminal" in nature). The burden of proof at an adjudication hearing is the beyond-a-reasonable-doubt standard applicable to criminal cases. TEX. FAM. CODE ANN. § 54.03(f). Further, the standards applicable in criminal matters are used to assess the sufficiency of the evidence underlying a finding that a juvenile engaged in delinquent conduct. *See In re D.A.K.*, 536 S.W.3d at 847.

Accordingly, in reviewing the legal sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found the essential elements of the offense beyond a

9

reasonable doubt. *In re R.R.*, 373 S.W.3d 730, 734–35 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979)); *see also Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). The fact-finder is the sole judge of the weight and credibility of the evidence and may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Jenkins v. State*, 870 S.W.2d 626, 628 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd); *see also In re R.D.*, 486 S.W.3d 130, 133 (Tex. App.—Fort Worth 2016, no pet.). Thus, we may not re-evaluate the weight and credibility of the evidence and substitute our own judgment for that of the fact-finder. *In re R.D.*, 486 S.W.3d at 133 (citing *Issassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010)). Rather, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Id.*; *see also Williams*, 235 S.W.3d at 750; *Johnson v. State*, 419 S.W.3d 665, 671 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). We presume that the fact-finder resolved conflicting inferences in favor of the verdict and defer to that determination. *In re I.F.M.*, 525 S.W.3d 884, 887 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

In viewing the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of

an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Kibble v. State*, 340 S.W.3d 14, 18 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd); *see also In re C.J.*, 285 S.W.3d 53, 55 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

*Analysis*

The version of Texas Education Code section 37.125 that applied to appellant's offense provided, in pertinent part, as follows:

> (a) A person commits an offense if, *in a manner intended to cause alarm . . . to another person . . .* , the person intentionally . . . threatens to exhibit or use a firearm:
>
> (1) in or on any property, including a parking lot, parking garage, or other parking area, that is owned by a private or public school; . . . .

*See* Act of May 23, 2007, 80th Leg., R.S., ch. 704, § 1, 2007 Tex. Gen. Laws 1331, 1331 (amended 2017) (current version at TEX. EDUC. CODE ANN. § 37.125(a)(1)) (emphasis added). Thus, to establish that appellant committed an offense, the State was required to prove that she, (1) in a manner intended to alarm another person, (2) intentionally threatened to exhibit or use a firearm (3) on school property. *See id.*

Here, appellant does not dispute that she intentionally threatened to exhibit or use a firearm on school property. *See id.* Rather, she asserts that the evidence does not support the first element, emphasized above, that she made such threats in a manner intended to cause alarm to another person, i.e., the complainants. *See id.*

11

Generally, a defendant's intent may be inferred from circumstantial evidence, including her acts, words, and conduct. *In re R.D.*, 486 S.W.3d at 134 (citing *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004)). The term, "alarm," is not defined in section 37.125. However, "alarm" has been generally defined as "fear or terror resulting from a sudden sense of danger." *Lovett v. State*, 523 S.W.3d 342, 347 (Tex. App.—Fort Worth 2017, pet. ref'd) (quoting *Alarm*, WEBSTER'S THIRD NEW INT'L DICTIONARY (2002)).

In *In re R.D.*, the Fort Worth court of appeals examined whether threats were made in a manner "intended to cause alarm" to another person, under section 37.125. 486 S.W.3d at 134. There, a campus security officer, having concluded that the student was skipping class, brought the student to the on-campus intervention teacher. *Id.* at 132. As the officer held the student by both arms, the student declared to the officer, "I'm going to get you. I'm going to kill you." *Id.* According to the teacher, after the officer sat the student down and left, the student continued, "I swear on my momma. I'm going to bring something here, bring a gun here and kill him." *Id.* After the teacher and another student cautioned the student to stop, the student continued saying that he was going to "get" the officer. *Id.* The student then left the room and ignored repeated requests that he return. *Id.*

The teacher testified that, although the officer had heard the student's initial threat to kill him, the officer was not present when the student stated that he was

12

going to bring a gun to school and do so. *Id.* The teacher stated that he was not afraid of the student and did not know whether he was carrying a weapon. *Id.* The student testified that he was not skipping class, as the officer had alleged, and that the officer's conduct made him upset. *Id.* The student denied having directly threatened the officer or that he had access to a gun. *Id.* He asserted that he never intended for the officer to hear his comments. *Id.* Based on the evidence, the trial court adjudicated the student delinquent. *Id.*

On appeal in *R.D.*, the court concluded that it was reasonable to infer that the student was angry with the officer and that the student's statements, coupled with the fervor in which he repeated them, followed by his flight from the classroom, gave rise to a reasonable inference that the student knew that his actions and words would be communicated to the officer. *Id.* at 135. Thus, it was reasonable to infer that the student intended for his threats to be conveyed and that they were intended to cause alarm. *Id.* The court held that the cumulative force of the evidence supported the trial court's finding that the student intended to alarm the officer when he repeatedly stated that he was going to "kill" him by bringing a gun on school grounds and shooting him. *Id.*

Here, M.B. testified that, while she, appellant, and T.O. were walking back to class from the school library, appellant told them that she was "going to shoot up the school" and had access to a gun. M.B. told appellant that she was "crazy for doing

13

something like that because she could go to jail for it." Appellant replied that "that was the point" and laughed. M.B. noted that appellant's laughter was not "the joking type." M.B. testified that she was alarmed and feared for her life. She was concerned that appellant was "going to shoot up the school" and would shoot her or her friends. When they arrived back in their classroom, appellant asked M.B. how to spell two students' names, J.D. and D.G., and wrote something in a book. Appellant then told her that she would let her know when she was "going to shoot the school," and added that it would occur during her Spanish class because students in that class had been rude to her. M.B. did not report the matter to school officials because she was afraid that appellant would discover that she had told. Rather, M.B. reported appellant's statements to her mother by text. M.B. also told V.K., who was J.D.'s best friend, to warn J.D. that appellant had listed her as someone whom she would shoot. After class, M.B. also went to find J.D.

T.O. testified that, at first, she thought that appellant was joking. However, after appellant named specific students, i.e., J.D. and D.G., that she intended to shoot, T.O. felt nervous and feared for her life. She noted that it was the most afraid that she had ever been. T.O. testified that appellant told her that, on the day that the shooting was to occur, T.O. would hear appellant running down the hallway, hear the "sound of the gun going against the locker," and hear appellant saying, "I'm coming for you." T.O. believed that appellant intended to alarm her, and she feared

14

for her safety and for that of the other students. T.O. decided that, after class, she would report the matter to school officials. However, before she got to the office, another student had already reported it.

V.K. testified that she had known appellant since elementary school, knew her well enough to discern when she was joking and when not, and V.K. believed that appellant was not joking and intended to scare her. Immediately after class, V.K. told J.D. about appellant's threat. V.K. testified that she then went to the principal's office because she was scared but did not report the matter at that time.

J.D. testified that she took appellant's comments seriously, felt that appellant intended to scare her, and felt that her life was in danger. She reported appellant's comments to school officials.

Trahan testified that he obtained statements from M.B., T.O., V.K., and J.D., and that they each reported similar facts regarding a threat to the campus involving a gun. Further, based on his investigation, he believed that appellant had made her threats to bring a firearm to school and use it with a serious intent to alarm people.

Appellant testified that she made up the threats because she did not like certain students who had picked on her and that she meant her threats as a joke and never meant to scare anyone. In her statement to Trahan, she stated:

> What I said I me[a]nt as a joke. I had no intention of harming anyone. What I said is that I would help but it was a joke. I said I would help if anyone had the idea but it was a joke. I don't want to harm anyone. I

15

don't like violence. I said I would help if anyone had the idea to shoot up the school.

Again, a defendant's intent may generally be inferred from circumstantial evidence, including her acts, words, and conduct. *In re R.D.*, 486 S.W.3d 130 at 134. Here, like in *R.D.*, appellant repeated her threats to "shoot up the school" to M.B., T.O., and V.K. Appellant told M.B. and T.O. that she had access to a gun and explained to T.O. how she planned to execute the day of the shooting. Appellant specified that she intended to shoot students in her Spanish class because they had been rude to her, and she named specific students whom she intended to shoot, including J.D., who was in her Spanish class. M.B., T.O., and V.K. each testified that appellant communicated her threats in a serious manner that they believed was intended to, and did, scare or alarm them. Further, like in *R.D.*, although J.D. did not hear firsthand appellant's threat to shoot her, the jury could have reasonably inferred that appellant knew that her threat to shoot J.D. would be communicated to her by her classmates, particularly her best friend, V.K. *See id.* at 135. And, J.D. testified that she took appellant's comments seriously, felt that appellant intended to scare her, and felt that her life was in danger. The cumulative force of the evidence supports the jury's finding that appellant intended to alarm each of the complainants when she repeatedly threatened to bring a gun to school and shoot students. *See id.*

Appellant argues that the evidence that she intended to alarm is insufficient because she meant her threats as a joke and never meant to scare anyone. However,

16

the jury could have chosen to believe the testimony of M.B., T.O., V.K., and J.D. and to disbelieve appellant's testimony that she made her threats in jest and did not intend to alarm the complainants. *See Sharp*, 707 S.W.2d at 614 (noting that fact-finder is sole judge of weight and credibility of evidence and may choose to believe or disbelieve any portion of witnesses' testimony); *Jenkins*, 870 S.W.2d at 628.

Appellant further argues that the evidence is insufficient to show intent to alarm M.B. or T.O. because the evidence does not show that she was "angry or causing trouble to anyone when the subject of the shooting arose." Appellant testified, however, that she made the threats because students in her Spanish class, including J.D., were "messing with" her, talked about her and her friends, and caused a lot of trouble. From this testimony, the jury could have reasonably inferred that appellant was upset with these students.

Appellant also suggests that the evidence is insufficient to show intent to alarm because she did not target M.B., T.O., or V.K. Section 37.125 requires only that a threat to exhibit or use a firearm be communicated in a manner intended to cause alarm to "another person," i.e., the complainant. *See* Act of May 23, 2007, 80th Leg., R.S., ch. 704, § 1, 2007 Tex. Gen. Laws 1331, 1331 (amended 2017). Section 37.125 does not require that the threat be directed at the complainant.

Viewing the evidence in the light most favorable to the verdict, we conclude that the jury could have found beyond a reasonable doubt that appellant, in a manner

intended to cause alarm to another person, intentionally threatened to exhibit or use a firearm on school property. *See id.*; *In re R.D.*, 486 S.W.3d at 135; *see also Jackson*, 443 U.S. at 318–19, 99 S. Ct. at 2788–89; *Williams*, 235 S.W.3d at 750. Accordingly, we hold that the evidence is legally sufficient to support the trial court's adjudication of appellant as delinquent.

## Conclusion

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.

Do not publish. *See* TEX. R. APP. P. 47.2(b).

18