

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-23-00199-CR

———————————————————

TEAGAN AUBREE FITZGERALD, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CR24730

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

## I. Introduction

A jury found Appellant Teagan Aubree Fitzgerald guilty of burglary of a habitation, and the trial court sentenced her to 10 years' confinement. *See* Tex. Penal Code Ann. § 30.02(a)(1), (3), (c)(2) (defining burglary of a habitation); *see also id.* § 12.33 (stating that second-degree-felony punishment range is 2 to 20 years and up to a $10,000 fine). In two points, Fitzgerald complains that that the trial court erred by denying her motion to suppress and that the evidence is insufficient to support her conviction. Because the trial court did not err by denying her motion and because the evidence is sufficient, we will affirm.

## II. Sufficiency

In her second point,[1] Fitzgerald argues that the evidence is insufficient to support her conviction because the State failed to show that the burglarized structure was a habitation.

### A. Standard of review and applicable law

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.

---

[1]We begin with Fitzgerald's second point because if the evidence is insufficient, we need not reach her first point. *See, e.g., Lovett v. State*, 523 S.W.3d 342, 349 (Tex. App.—Fort Worth 2017, pet. ref'd) (rendering a judgment of acquittal on one of the appellant's convictions when evidence was insufficient to support it).

307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021). The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018).

To convict Fitzgerald of burglary of a habitation, the jury had to determine beyond a reasonable doubt that she had intentionally or knowingly entered a habitation without the effective consent of Michael Buckman, its owner, and attempted to commit or committed theft of his property: "2 shop vacuums and/or flooring materials." *See* Tex. Penal Code Ann. § 30.02(a)(1), (3), (c)(2).

For purposes of burglary, a "habitation" is a structure "that is adapted for the overnight accommodation of persons." *Id.* § 30.01(1). What makes a structure "suitable" or "not suitable" for overnight accommodation "is a complex, subjective factual question fit for a jury's determination." *Salazar v. State*, 284 S.W.3d 874, 877 (Tex. Crim. App. 2009) (quoting *Blankenship v. State*, 780 S.W.2d 198, 209–10 (Tex.

3

Crim. App. 1989) (op. on reh'g)). "The jury may look to a host of considerations such as the contents of the structure, including bedding, electricity, plumbing, or furniture; the jury may also look to and consider the type of structure and its typical use as a means for overnight accommodation." *Id.* The determination whether a burglarized place is a "building" or "habitation" will be overturned on appeal only if the appellant can show that no reasonable trier of fact could have found the place to have been a habitation under the criteria above. *Blankenship*, 780 S.W.2d at 209–210.

In *Blankenship*, for example, the court held that the following evidence supported the jury's finding that the burglarized structure was a habitation: (1) it was a house once lived in by the complainant; (2) it was at the time of trial "rented from time to time"; (3) it had a living room and two bedrooms; (4) it was wired for electricity and had water readily available; (5) it had two window air conditioners fully installed; (6) it was only 300 yards from the complainant's then-current residence; (7) it was located along the only driveway providing access to the complainant's residence; (8) it was used to store some of the complainant's household items; and (9) the owner testified that the structure was adapted for the overnight accommodation of guests. *Id.* at 210.

4

**B. The State's habitation evidence**

Deputy Chandler Works,[2] Michael Buckman, and Benjamin Witzlib, the owner of the property adjacent to the Buckmans' property, testified at trial.

### 1. Deputy Works

Deputy Works testified that on March 1, 2020, he was called out to the Buckmans' property on a theft report after a "third party reported that they believed that somebody was at their neighbors' residence stealing items." He and two other deputies found an unsecured gate around the fenced property. The property had a manufactured double-wide home on it, one of the home's windows was open, and the home's front door was ajar. The deputies secured the home after determining that no one was inside of it or inside the large metal barn behind it. The home contained multiple bedrooms, two bathrooms, some furniture, a washer and dryer, dishes, pots, pans, clothing, a mattress, and other personal items, and it appeared that "somebody had been staying in [the main bedroom]."

Deputy Works opined that the home was a habitation[3] and stated that a home did not have to be presently occupied or have running electricity or water to count as

---

[2]Deputy Works was employed by the Wise County Sheriff's Office at the time of the offense and the Parker County Sheriff's Office at the time of the trial.

[3]Fitzgerald's counsel objected to Deputy Works's testifying as an expert and raised other evidentiary objections, none of which—other than suppression—are complained about in this appeal. When performing a sufficiency review, we must consider all the evidence admitted at trial, even if it was improperly admitted. *Jenkins v.*

a habitation as long as it was established for overnight accommodation. On March 1, 2020, the utilities to the Buckmans' home were connected but not turned on. The publication of Deputy Works's body camera footage of the home allowed the jurors to see the home's exterior and interior for themselves.

The deputies contacted the Buckmans, the home's owners, and one of the Buckmans told Deputy Works that one of the missing items was flooring. Deputy Works testified that Witzlib, the Buckmans' next-door neighbor, "said the suspected female [i.e., Fitzgerald] was staying in a trailer on his property." That trailer, a recreational vehicle (RV), was approximately 75 to 100 yards from the Buckmans' home, and the deputies walked over to it. They knocked—to no response—but did not enter the RV because they did not have a warrant and because "[t]he actual property owner wasn't on scene to give [them] consent." Deputy Works's body camera footage showed a pile of new flooring on a blue tarp outside the RV. Deputy Works testified that two other neighbors told him that they had recently "seen the female enter the actual habitation on the Buckmans' property."

### 2. Benjamin Witzlib

Witzlib lived on the property next door to the Buckmans' home. He met Fitzgerald when—after buying his property in June 2019—he went out to visit it and found her and "some other old guy" removing "stuff" from the house he had

---

*State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

6

purchased. Fitzgerald and her companion told him that they had permission from the property's seller, and Witzlib stated that this had been fine with him "because it was all junk." Months later, he encountered Fitzgerald one night on his drive back from a gas station; he gave her a lift to where she was staying—a less-than-reputable house in the same neighborhood that he described as "her main place, the place she lived at full time"[4]—and he hired her to pick up rocks on his property. Witzlib paid for her rock-picking in cash.

The RV where Fitzgerald had been staying "off and on" was Witzlib's bee shed, which he described as "pretty gross," "not livable," and inhabited by bees. She did not pay him for permission to stay there, and he did not give her exclusive access or a key to it. She began staying there occasionally after she had been beaten up in January 2020, when she showed him a black eye. Witzlib said that he had told her, "[I]f you're feeling in danger, you can go there."

Witzlib met the Buckmans after he bought his property, and they exchanged phone numbers. He stated that the Buckmans usually came out once a month to work on their fence, cut trees, and "just [do] things to keep the place up." When Fitzgerald asked him about the Buckmans' land and told him that she thought it was abandoned

---

[4]Witzlib described Fitzgerald's principal residence as "the first house [when] you pull into . . . the subdivision," and stated that it was a "crack house" where two people had overdosed.

and that she had filed court papers to become its owner,[5] he told her that he knew the owner and not to go over there because she did not have permission to be there.

On March 1, 2020, Witzlib was pulling into his driveway when he saw that the front door of the Buckmans' home was open and that two people—one of whom was Fitzgerald—were on the Buckmans' land, which was three feet from his lot line. Fitzgerald and her companion were fixing a tire on the Buckmans' flatbed trailer. He walked over and told Fitzgerald to get off the property and that he was going to call the police. When Fitzgerald told him "something . . . like, I'm taking over this land because it's abandoned," he told her to take it up with the police.

On his walk back to his own property, Witzlib used his phone to take photos "of them actually stealing the stuff" and called the Buckmans as Fitzgerald and her companion left with the trailer. Witzlib provided his photos and security-camera footage to the police.

During Witzlib's testimony, Fitzgerald's counsel objected that there had been an unlawful entry into the RV and received a running objection.[6] Over Fitzgerald's

---

[5]*Cf.* Tex. Civ. Prac. & Rem. Code Ann. §§ 16.024–.028 (setting out adverse-possession limitations periods); *Cowden v. Henderson*, No. 02-23-00382-CV, 2024 WL 2854876, at *9 (Tex. App.—Fort Worth June 6, 2024, pet. filed) (mem. op.) (reciting adverse-possession elements of actual and visible possession of the disputed property that is exclusive, adverse, and hostile to the claim of the owner of record title, and is continuous for the applicable limitations period).

[6]This recitation of the facts includes details about the RV that are more pertinent to Fitzgerald's first point but are logical here.

objection, Witzlib testified that he had allowed Michael Buckman to go into the RV to look for his personal property. He later testified, "I let [Michael] go in after -- after he got robbed, basically, and filed a police report, he asked me if he could go in there and -- and see if he could recover any of his items, and I said go ahead, it's open, you know."

Witzlib testified that he thought he had given Fitzgerald permission to stay in the RV in January 2020, after she had been beaten up, and he recalled seeing her with injuries only on that occasion. He stated,

> And so from January to when this incident happened -- because I really, if she felt she was in trouble, [I] did not care if she stayed there, in between that time and the time I caught her robbing my neighbors. *Now, once you get caught robbing my neighbors, I'm gonna say, you are not welcome at any time, even if you feel you're in danger, to stay at this place.*

[Emphasis added.] Witzlib stated that after the incident, Fitzgerald had called him about retrieving her seizure medication from the RV, and he told her, "[I]f it's for that, go get it, and be gone." Neither the State nor the defense asked Witzlib to clarify whether he gave her that instruction before or after he allowed Buckman to look inside the RV.

### 3. Michael Buckman

Michael testified that he and his wife lived in Colleyville and owned the 2.5-acre property next door to Witzlib's property. The trial court admitted into evidence the Buckmans' property-ownership paperwork—their January 24, 2000 warranty deed and

9

a release of lien recorded in Wise County on July 20, 2010, for the property's purchase-money loan.

Michael had been in the stonecraft business for 40 years, and he and his wife had put an 1,800-square-foot storage shed on the property for his business and a brand-new three-bedroom, two-bath mobile home on it for his foreman to rent from them. The foreman had lived on the property for 12 years. The Buckmans' son and his family then lived there when they needed a place to stay. Michael stated that the last time anyone had lived full-time in the home was late 2018, although their son, who had moved back briefly in 2019 after he and his wife split up, had started removing cabinets and pulling up the carpet to renovate the home in June 2019. Around March 2019, the Buckmans put in stonework at the front of the house and put in stone retaining walls. They had visited the property regularly except for the six-month period before March 2020, when they were busy caring for Michael's mother-in-law, who had become wheelchair-bound and who had moved into their Colleyville home.

Michael testified that the property had been secured with a fence and a gate with a padlock and chain. The house had a standard lock and deadbolt, and the shed was also secured with locks. The house had been "totally furnished when [his] son moved in." His son had decided to do some remodeling before his divorce but had never gotten beyond the demolition phase, resulting in a missing wall and some partially installed flooring. Michael testified, "The flooring had partially gone down,

10

and then -- and it wasn't completed yet, going back down. But all the material was there prior to March 1st, and then, of course, it was found next door." Michael did not state when the home's utilities had been turned off, but they were not in service on March 1, 2020. Michael called to reinstate service, and as of March 3, the home's utilities were back on. The Buckmans had never turned off the storage shed's utilities, which were on a separate account.

Michael stated that Witzlib "knew [they] didn't come out there much. . . [and] what [they] were going through, but [they were] in touch, and if he saw anything," he would "give [them] a holler." On March 1, Michael received Witzlib's call that someone in a white GMC truck was taking the Buckmans' flatbed trailer from the side of the house,[7] that their shed door was open, and that one of the neighbors up the street had seen someone inside their home. Witzlib also sent to him his photos and video, and the Buckmans called the police.

Michael testified that he did not know Fitzgerald and had not given her permission to be on his property, to enter his home, or to take his flooring or anything else. When he and his wife went out to meet the police, they saw that the gate's chain and padlock had been cut, the house's front door was open, the house

---

[7]Michael testified that he had to go to court to prove his ownership of the 20-foot flatbed trailer that he used for equipment hauling.

had an open broken window,[8] and the storage shed's lock had been broken. The house was in "total disarray," and their son's important documents—a birth certificate and Social Security card—were missing, as were laminate flooring, shop vacuums, their son's tools, coffee pots, and silverware. Michael stated that it looked like someone had been staying in the house because "the bed was just a mess," and there were dirty dishes that the Buckmans had never dirtied. The home had no running water at the time, so there was no way to clean anything. Between his son's demolition efforts and the vandalism discovered on March 1, it took Michael around 300 hours to get the home back in order.

When asked whether the home had been move-in ready other than turning on the utilities, Michael said yes, but then clarified, stating, "I mean, it would have to be us, because it was a mess, you know." He explained that except for his son's renovation-related demolition and the vandalism, the home had been move-in ready.

Michael testified that later on March 1—when Witzlib's dogs ran over to the Buckmans' property—on his way to return the dogs to Witzlib's house, he "saw the laminate flooring at the [RV]." Michael stated that he knew it was his flooring because that was the type he and his wife had picked out, it was brand new and "still in the box," and it had been missing from the home.

---

[8]During cross-examination, Michael stated that the window had already been broken and that he had put a small board over it. He assumed that the home had been entered through the window because the front door had a deadbolt.

Michael called Witzlib and told him, "[H]ey, you know, I was taking your dogs back[,] and I saw my flooring that we're missing in front of your trailer, and there might be some other things. And [Witzlib] said, ['Y]ou have my permission to [go] in there and look.[']" He told Witzlib that it looked like it was going to rain and asked him, "[D]o you mind if I get my flooring back? And [Witzlib] said, ['S]ure, go ahead, get it. And if you want, look in there and see if there's anything else that's yours.[']" Michael stated that some of the flooring was on top of a blue tarp and some of it was under the tarp.

Michael testified that after Witzlib gave them permission to enter the RV, he and his son went over there the next morning, March 2, stating,

> [W]e went in and looked. There was my coffeepot. There w[ere] two shop vacs I had. . . . There w[ere] some tools in there of my son's, and there was -- there was dog feces in that camper.[9] And that's when I said, ["]I -- I do not want that back.["] But I grabbed the flooring, which was outside, and took it back to the house . . . and just left the rest of the stuff.

Michael said that the RV's interior was "[t]errible" and a "total mess." Before entering the RV, Michael had been told that Witzlib "might have granted [Fitzgerald] permission to stay there."

---

[9]Witzlib testified that Fitzgerald's dogs had left the RV's interior "covered in dog poop."

## C. Analysis

Fitzgerald argues that because the Buckmans' manufactured double-wide home did not have electricity, had been used to store property, and had not had a full-time occupant since 2018, the evidence is insufficient to support her burglary-of-a-habitation conviction.[10] We disagree.

The record reflects that the mobile home, which had previously been rented to the Buckmans' foreman and then occupied by the Buckmans' son and his family, contained multiple bedrooms and bathrooms and was fully furnished. Further, it appeared that someone—although not the Buckmans—had been staying there within the preceding six months, despite the lack of electricity and running water, because that person left dirty dishes and contributed to the disarray, including making a mess of a bed. *See Blankenship*, 780 S.W.2d at 199, 210 (noting that jury's habitation finding

---

[10]Fitzgerald refers us to *Kemp v. State* to support her argument that the home was not a habitation, but the issue in that case was whether there was more than a scintilla of evidence to support giving a lesser-included-offense instruction on burglary of a building. No. 02-18-00540-CR, 2020 WL 1466310, at *1 (Tex. App.— Fort Worth Mar. 26, 2020, no pet.) (mem. op., not designated for publication). In *Kemp*, the home at issue had a disconnected oven on the front porch, and its interior brimmed with trash bags, boxes, and bins of goods because the owner was using it for storage while she moved into another house. *Id.* We concluded that the defendant had been entitled to a lesser-included instruction because the evidence established "that the crime and its setting were subject to differing interpretations." *Id.* at *3. Here the charge included lesser-included instructions on burglary of a building, criminal trespass of a habitation, and criminal trespass, and the question is the sufficiency of the evidence to support the jury's finding beyond a reasonable doubt that the Buckmans' mobile home was "adapted for the overnight accommodation of persons." *See* Tex. Penal Code Ann. § 30.01(1).

was supported because—among other things—the structure was wired for electricity, even though the electricity was not turned on). In *Kemp*, we noted that a relevant factor in determining whether a structure is a habitation is whether it "is of such a character that it was probably intended to accommodate persons overnight (e.g.[,] house, apartment, condominium, sleeping car, mobile home, or house trailer)." 2020 WL 1466310, at *2 (referencing *Blankenship*, 780 S.W.2d at 209).

The jury saw the body camera footage of the home's interior and could have reasonably concluded that despite its lack of electricity and running water, it was of such a character that it was probably intended to accommodate persons overnight and was capable of overnight habitation, even more so than Witzlib's RV, which Witzlib had described as "not livable," "covered in dog poop," and inhabited by bees. *See id.*; *see also Salazar*, 284 S.W.3d at 877 (stating that what makes a structure suitable for overnight accommodation is a complex, subjective fact question for the jury). We overrule Fitzgerald's second point.

### III. Suppression

In her first point, Fitzgerald argues that the trial court abused its discretion by overruling her Article 38.23 objection to Michael's warrantless search of the RV, which contained some of the evidence—the two shop vacuums—supporting her conviction. The State responds that Fitzgerald did not preserve this complaint.

15

## A. Preservation

### 1. Applicable law

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). Further, the party must obtain an express or implicit adverse trial-court ruling or object to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020). If a trial court hears objections to proffered evidence outside the jury's presence and rules the evidence admissible, the objections are deemed to apply when the evidence is admitted before the jury without the necessity of repeating the objections. Tex. R. Evid. 103(b); *Haley v. State*, 173 S.W.3d 510, 517 (Tex. Crim. App. 2005); *Geuder v. State*, 115 S.W.3d 11, 13–14 (Tex. Crim. App. 2003); *Ethington v. State*, 819 S.W.2d 854, 859 (Tex. Crim. App. 1991).

### 2. Fitzgerald's objections

After the trial's first day concluded, Fitzgerald's counsel complained that Witzlib's testimony the next day might raise "a legitimate illegal search and seizure question for anything obtained in a residence without a search warrant." The trial court replied, "I guess when he's called, if you -- if you feel like you need to do something outside the presence of the jury, you can let me know."

The next day, before Witzlib's testimony, Fitzgerald's counsel stated, "I would like to reurge the motion that the Court inquired about yesterday that I believe evidence was unlawfully obtained by . . . entering the [RV] that my client has been living in, according to their -- their own evidence." During a hearing outside the jury's presence, the prosecutor argued that Fitzgerald had failed to establish her standing to complain about the search, and the trial court informed Fitzgerald's counsel that he would need to address standing.

Outside the jury's presence, Witzlib testified that the RV was his bee shed and that he had allowed Fitzgerald to stay there after she came over in distress and asked if she could stay there "a couple of nights." Fitzgerald had told him that her boyfriend had been beating her, and Witzlib had felt bad for her. At the time, she had been doing rock-picking work for Witzlib for around eight months, on and off. Witzlib stated that Fitzgerald's use of the RV was "open-ended. If she [was] in fear, she could stay there," and her ability to stay there was not tied to her compensation, because he paid her in cash for her rock-picking work.

At the conclusion of Witzlib's suppression-hearing testimony, the prosecutor again raised Fitzgerald's lack of standing, and her counsel replied that Fitzgerald had a reasonable expectation of privacy in an overnight residence. The trial court stated, "I do not believe that standing has been established." Fitzgerald's counsel then informed the trial court that he might make an offer of proof.

At the conclusion of Witzlib's testimony before the jury, Fitzgerald's counsel asserted that Witzlib's testimony during the suppression hearing was "in a little bit of conflict with his testimony in front of the jury in terms of the frequency that [Fitzgerald] stayed in the camper and the length of time she stayed in the camper on his property." He referenced *Wilson v. State*, 98 S.W.3d 265 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd),[11] argued that Fitzgerald was entitled to a reasonable expectation of privacy as an overnight guest, and asserted that under Article 38.23 "private actors cannot obtain evidence unlawfully." The trial court denied his motion to exclude.

Before Michael's testimony set out above in our sufficiency review, Fitzgerald's counsel renewed his "exclusionary rule" objection. The trial court replied that its ruling continued to stand and granted Fitzgerald a running objection.[12]

---

[11]In *Wilson*, our sister court concluded that an overnight guest of a registered hotel guest shares the registered guest's reasonable expectation of privacy in the hotel room and thus has standing to contest the search. 98 S.W.3d at 269.

[12]In determining whether a trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than on evidence introduced later. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996). But this general rule does not apply when the parties consensually relitigated the suppression issue during trial on the merits. *Gutierrez*, 221 S.W.3d at 687; *Rachal*, 917 S.W.2d at 809.

### 3. Analysis

The record reflects that while Fitzgerald filed no written motion to suppress,[13] she orally moved to suppress the evidence found in the RV based on a warrantless search; the trial court determined that she lacked standing to make that complaint; and she repeatedly argued for suppression throughout the trial. Accordingly, we conclude that she preserved her complaint and will consider whether she lacked standing. *See Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016) (stating that to preserve an objection, "a party need only let the trial court know what he wants and why he feels himself entitled to it clearly enough for the judge to understand him").

## B. Standing

A person has standing to challenge a search or seizure's reasonableness (1) if he has a subjective expectation of privacy in the place or object searched and (2) if society is prepared to recognize that expectation as reasonable or legitimate. *State v. Granville*, 423 S.W.3d 399, 405 (Tex. Crim. App. 2014); *see also State v. Betts*, 397 S.W.3d 198, 203–05 (Tex. Crim. App. 2013) (discussing standing of defendant who did not live in, but had reasonable expectation of privacy in, aunt's backyard). The issue of whether a legitimate expectation of privacy exists is determined by a trial court after

---

[13]Although Fitzgerald referenced Article 38.23 at trial in the context of her suppression complaint, she did not request an Article 38.23 instruction in the jury charge or object to the lack of such an instruction, and on appeal, she again references it only in connection with her suppression issue and does not complain of charge error.

consideration of the totality of the circumstances, which may include whether the person had a proprietary or possessory interest in the place searched; whether she had the right to exclude others from the place; whether she took normal precautions, prior to the search, that are customarily taken to protect privacy in the place; whether the place searched was put to private use; and whether her claim to privacy is consistent with historical notions of privacy. *See King v. State*, 670 S.W.3d 653, 656–57 (Tex. Crim. App. 2023).

Absent a legitimate expectation of privacy, a defendant lacks standing to raise this issue and we may not consider the substance of her complaint. *Id.* at 656.[14] The defendant bears the burden of establishing standing, including establishing her own privacy interest in the premises searched at the time of the search. *Id.* at 657–58. We must uphold the trial court's ruling on a suppression motion if it is both supported by the record and correct under any applicable legal theory. *Martin v. State*, 620 S.W.3d 749, 759 (Tex. Crim. App. 2021); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003).

During Witzlib's testimony before the jury, he stated that on March 1, 2020, he had ordered Fitzgerald off the Buckmans' land when he saw her messing with the Buckmans' flatbed trailer. He advised her that he was going to call the police, and he

---

[14]In *King*, the court held that the defendant had failed to establish a privacy interest in the tractor-trailer in which he had been living because the seizure of evidence from it occurred both after his arrest and after the tractor-trailer had been returned to his employer. 670 S.W.3d at 658–59.

provided the police with evidence against her. Witzlib testified that after the burglary, Fitzgerald was no longer welcome to stay in the RV and that he gave Michael permission to look inside the RV. That is, after he caught Fitzgerald in the act of stealing the Buckmans' trailer, to the extent Fitzgerald had been an overnight guest, she was one no longer, and Witzlib made this clear to her by informing her that he was calling the police and telling her that she could retrieve her medication from the RV and then "be gone." Accordingly, the trial court did not err by concluding that Fitzgerald lacked standing to challenge Michael's search of the RV.[15] *See King*, 670 S.W.3d at 658–59. We overrule Fitzgerald's first point.

### IV. Conclusion

Having overruled both of Fitzgerald's points, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 22, 2024

---

[15]The record also reflects that some of the burglary evidence—the flooring—was located outside of the RV and thus not subject to suppression.